# WESLEY B. PORCH

*v.*

# THE AGNEW COMPANY.

[Decided August 22d, 1905.]

1. A corporation contracted to pay for the services of an employe by issuing to him a part of its stock. The stock was issued to the president, in trust for the employe. Subsequently it was agreed between the employe and the president that the latter should hold a half of the stock for his own use, and that the former should be paid a money compensation for his services.—*Held*, that the employe could not recover from the company the money compensation, as a recovery thereof would enable him to obtain compensation twice.

2. If directors of a corporation are employed in the business of the corporation, and agree to pay themselves a stipulated sum, the agreement is void, and no recovery can be based upon such contract, but for such services as they render they may recover upon a *quantum meruit.*

3. An officer of a corporation paid for $25,000 worth of property for it. He received its bonds to that amount on that account. Subsequently the company adopted a resolution pledging to him $15,000 more bonds as collateral. At this time the company was insolvent. At the time the $25,000 was paid the understanding was that he should receive bonds as collateral only to that amount.—*Held*, that the resolution was void as an attempt in contemplation of insolvency to protect the officer, and in violation of the provision of the Corporation act forbidding directors of any corporation unable to pay its ordinary debts to transfer its property.

4. A contractor, installing a kitchen equipment in a hotel and attaching the same to the building, in accordance with the owner's intention that it should permanently become a part of the building, is entitled to a mechanics' lien.

5. A corporation, organized to construct and manage a hotel, employed its secretary to manage the details of the work of construction. He employed a contractor to install a kitchen equipment. While the work was being done the president of the corporation was in frequent attendance, and the equipment was accepted by the corporation when it subsequently started in business.—*Held*, that the equipment was ordered by competent authority, entitling the contractor to a lien.

6. Under *P. L. 1898 p. 550* § *28*, which provides that the sale under a lien claim judgment shall pass title, subject to any mortgage given under the circumstances stated in section 15, which provides that any mortgage recorded before a lien claim is filed shall have priority to the

extent of money actually advanced by the mortgagee and applied to the erection of any new building on the premises, a mortgagee cannot claim a lien superior to a mechanics' lien without showing that the money was loaned for and actually applied to the erection of a building on the premises; and proof that the money was spent in buying furniture for a building thereon is not sufficient.

On bill for insolvency, &c. On appeal from receiver's determination on claims, &c.

The defendant company has been decreed to be insolvent, and a receiver has been appointed.

The claims of creditors have been presented to him, several hearings have been held and a considerable amount of testimony has been taken. The master has reported his adjudication on the creditors' claims.

There are several appeals from the receiver's determination, which will be separately considered.

Wilmer R. Batt, a creditor, presented two claims to the receiver, one of $6,125 for compensation for the organization and incorporation of the defendant company, the other, $913.51, for his salary for services rendered to the defendant company.

The receiver admitted the claim of $913.51 for salary, &c., but rejected that for $6,125 for compensation for organization, &c., of the company.

Mr. Batt appeals from this rejection of the $6,125 claim.

Clarence M. Busch, a stockholder, bondholder and general creditor of the defendant company, appeals from the receiver's adjudication which admits Mr. Batt's $913.51 claim to a dividend.

The receiver has also refused to admit the claim of Clarence M. Busch, a bondholder, so far as it is based upon his holding $40,000 of the first mortgage bonds of the defendant company, delivered to him as collateral security for the payment of $25,000 advanced by Mr. Busch to the company.

Mr. Busch appeals from this decision of the receiver.

Mr. Busch also appeals against the following adjudications of the receiver:

The admission of the above-named claim of Wilmer R. Batt for $913.51, because nothing should have been allowed him; the admission of the claim of the DuParquet, Huot & Monense Company as a preferred mechanics' lien claim over certain bonds of the company, when no part of it should have been preferred over said bonds; the admission of the claim of Milligan & Webber for $3,125, when no part of it should have been allowed.

*Mr. Harrison H. Voorhees,* for Wilmer R. Batt.

*Mr. William M. Clevenger* and *Mr. George A. Bourgeois,* for DuParquet, Huot & Moncuse Company.

*Mr. Clarence L. Cole,* for C. M. Busch.

GREY, V. C.

The defendant company was the owner of a large hotel, situate immediately on the ocean front in Atlantic City. It was built in 1902, was completely furnished, and was in the conduct of active business at the time of its failure in the latter part of that year.

. Before it was decreed to be insolvent, the company had made a mortgage upon its property to the amount of $250,000, securing its bonds to that amount, which were issued at successive periods in its short life, in various denominations, largely to pay or secure the company's debts.

There were also mechanics' liens for work and labor done and materials furnished in the construction of the hotel. These aggregated a little over $3,000.

The validity of these liens on the hotel property was disputed, and under the provisions of section 81 of the Corporation act, and the order of this court, the property was sold by the receiver at public vendue.

His first sale was challenged because of its very low price, and the property was sold a second time, producing in the aggregate, for both real and personal, the sum of $75,100.

The claims of creditors have been presented to the receiver, who has passed upon them, and some of his adjudications have been appealed from, as above stated.

The claim of Wilmer R. Batt, referred to in the testimony taken by the receiver as "Dr. Batt," has been allowed as to $913.51, asserted to be due for salary for superintendence of the company's business, and rejected as to $6,125 for alleged services rendered in incorporating and organizing the company. The allowance is appealed from by Mr. Busch, another creditor, and the rejection by Dr. Batt himself.

The testimony shows that the salary item of $913.51 is a balance claimed by Dr. Batt for services rendered by him in overseeing and managing the construction of the hotel, and for general superintendence of the company's business.

Dr. Batt claims that the company's obligation to him on this item arose in this way: He asserts that an agreement between himself and the company was made by which fifty per cent. of the whole capital stock of the company should be given to him to compensate him in a lump payment for services of superintendence, &c. This appears in the testimony of Dr. Batt himself, and also, as he claims, in a resolution of the company, by which one-half of its capital stock, amounting to a par value of $125,000, is directed to be issued to Dr. Batt, as payment for superintendence and medical directorship. Dr. Batt testifies that he knew that this fifty per cent. of the whole capital stock of the company was in fact issued under this resolution to Mr. Busch, for him (Dr. Batt).

Dr. Batt further testifies that he and Mr. Busch afterwards made a bargain between themselves, by which Dr. Batt relinquished one-half of this stock ($61,125) in par value to Mr. Busch. Dr. Batt further testifies that it was arranged between him and Mr. Busch that thereafter, in lieu of this stock, he should receive a cash money compensation from the company for his work at the hotel. Thereafter he was so paid. The present claim of $913.51 is for a balance of this cash salary not yet paid to Dr. Batt.

In testifying about this transaction, Dr. Batt declares that

as far as the division of the stock which had been issued in Busch's name was concerned, it was personal between him and Busch; but as far as the arrangement as to salary was involved Batt supposed that Busch (who was president of the company) was speaking as president of the company.

When the company issued this $125,000 of capital stock to Mr. Busch, under its agreement with Dr. Batt that he should receive it for his services in superintendence of its affairs, and Dr. Batt accepted this disposition of that stock, and dealt with the stock thus issued as his own, by relinquishing one-half of it to Mr. Busch, in a personal agreement between them, the company had performed its part of its contract with Dr. Batt and had paid him for his services' in superintending its business. Dr. Batt does not claim to have surrendered or returned the stock to the company. Mr. Busch already had it in his possession for Dr. Batt's benefit, and Dr. Batt, by a personal agreement with Mr. Busch in the nature of an equitable assignment relinquished to Busch a one-half interest in that stock, so that Mr. Busch, in his personal capacity, became thereafter the owner of that half without any obligation to hold it for Batt's benefit. The effect of Mr. Busch's arrangement with Dr. Batt that thereafter the company should pay Batt in cash for his services was simply an agreement between Busch and Batt that they would keep the stock and that the company should pay Batt again in cash for his work at the hotel, for which it had already paid him by the issue of stock.

By this scheme, if permitted to succeed, the company would be made to pay Dr. Batt twice for the same service, once by the issue, for Dr. Batt's benefit, of half of its capital stock, part of which he transferred to Mr. Busch, and again by the monthly salary unpaid, part of which, $913.51, Dr. Batt now presents to the receiver as the basis of a claim to a dividend. There is no equity in such a claim, and it should have been rejected.

The receiver was, I think, mistaken in allowing this item, and the appeal from his adjudication should be sustained.

Dr. Batt appeals from the receiver's disallowance of the other item for $6,125 of bonds of the company, which Dr. Batt claims

are due to him under a resolution which he contends was passed by the board of directors at a first meeting held in Camden in January, 1902. The resolution is as follows:

"*Resolved*, That bonds for two and a half per cent. of the amount of capitalization be set aside for payment of the expenses of organization and incorporation, and be used as the president and treasurer may direct."

The meeting at which this resolution was passed is neither recognized nor entered in the regular minute-book of the company, which was kept by Dr. Batt himself as secretary and treasurer of the company. He claims that this Camden meeting was held in Camden ferry-house immediately that the company was organized, and produces a separate sheet of paper as a copy of its minutes.

The testimony indicates that some sort of a meeting was held at the Camden ferry-house. Mr. Bird, one of the incorporators who attended it, differs radically from Dr. Batt as to what was then done. Bird says they met simply to elect officers, and that is all that they did, and that Dr. Batt was a director.

The minute-book recites the first meeting to have been held in Atlantic City in March, 1902, and nothing is said about the above-quoted resolution. Dr. Batt was a director, and also secretary and treasurer. As secretary he signed this minute in the book. He testifies that he never received any bonds in accordance with that resolution. He further testifies that no different arrangement modifying the resolution was ever made.

It will be noted that the resolution does not recognize Dr. Batt as having theretofore rendered any services in the organization or incorporation of the company, nor employ him to render such services in the future, nor does it direct that any bonds be issued or delivered to him, nor is there any proof that the president and treasurer of the company ever directed that these bonds be delivered to Dr. Batt for services in regard to the company's incorporation, or for any other services.

Other testimony of Dr. Batt shows that for fees paid to lawyers, and for incorporation taxes paid to the state, and various

other like items, Dr. Batt submitted a bill for $500 and received in payment therefor the bonds of the company for that amount.

The services of Dr. Batt, relative to the incorporation and organization of the company, for which he claims to be entitled to $6,125 of bonds, must have been rendered before and at the time of the initiation of the company, if they ever were in fact performed. No proof was submitted to the receiver to show what these services were, nor when they were performed, nor at whose request, nor that the company, either by formal corporate action or by informal acceptance, recognition and ratification, became liable to pay for them to Dr. Batt.

The receiver, in my view, rightfully rejected this item of Dr. Batt's claim, upon the proof which was submitted to him.

Since the receiver passed upon the claims of Dr. Batt, the latter obtained leave to submit additional testimony in support of them. This further testimony has now been filed on this appeal. It consists wholly of explanatory and additional evidence from Dr. Batt himself and Mr. Bird, both of whom were examined before the receiver, and there apparently gave all the testimony upon this subject which was within their knowledge.

Before the receiver Mr. Bird testified that he was at the meeting held in Camden ferry-house; that Dr. Batt said he was having plans made; that it was talked over, but what the conversation was he was unable to say; that they met to elect officers and directors, and that was simply what they did.

In his new testimony, taken more than a year afterwards, he declares that it was agreed in the discussion at that meeting that Dr. Batt should receive two and one-half per cent. of the bonds of the company for his services in promoting and selling the bonds of the company. He did not think it was mentioned who was to determine when this work was done. When confronted with the resolution drawn by Dr. Batt himself, which does not mention the employment of Dr. Batt to promote the company, to sell its bonds, or to do anything else, and provides no compensation for him, Mr. Bird thinks the part of the resolution which directs that the bonds shall be used "as the president and treasurer may direct" is a mistake. Dr. Batt testified

before the receiver that no arrangement different from the resolution was ever made.

This new testimony adds nothing to the weight or credibility of Mr. Bird's evidence. His first deliverance, before the receiver rejected Dr. Batt's claim, which declares that they met in Camden simply to elect officers, and did it, is probably the better recollection, because that relation of the affair was given at a time much nearer to the happening of the incident, and was narrated without a definite purpose on Mr. Bird's part to support Dr. Batt's claim, which now clearly appears.

Dr. Batt, in his new testimony, attempts to contradict the terms of the resolution which he himself drew, and to show that at the Camden ferry-station meeting (in which he participated as director and officer of the company) there was an express agreement that he should be paid two and one-half per cent. of the amount of the bonds on the completion of the work, but that the president and treasurer (who was Dr. Batt himself) were to determine the time when the work was in fact completed. Dr. Batt himself says, however, that he did complete the promotion of the company as far as possible.

On this proof it is contended that Dr. Batt is entitled to the compensation which he says was agreed at the Camden ferry to be given him, *i. e.,* two and one-half per cent. of the bonds of the company, which were in all $250,000, making his claim on this item to be $6,125, at par of the bonds.

If this claim should be adjudicated as it is thus presented it must be held invalid, because it is precisely within the objection sustained in this court, and in the court of errors and appeals, in *Gardner* v. *Butler, 30 N. J. Eq. (3 Stew.) 702,* where it is held that if directors are employed in the business of the company, and agree to pay themselves a stipulated sum, the agreement is void, and no recovery can be based upon such contract.

In the same case it is held that for such services directors may recover upon the *quantum meruit.* But to support such a recovery there must be proof showing that the claimant was employed by the company to do certain work, that he did it, and that he deserves to be paid therefor the sum which in the judg-

ment should be awarded him. In this case every element of this proof is in such grave doubt and uncertainty that no conclusion can be formed in favor of the claim.

The result is that, notwithstanding the additional proofs, Dr. Batt's claims must both be rejected.

The next appeal is that of Clarence M. Busch, a stockholder, bondholder and general creditor, from the receiver's adjudication refusing to admit Mr. Busch's claim to be the holder of $40,000 of the mortgage bonds of the company, which Mr. Busch claims were lawfully and rightfully delivered to him as collateral security for the payment of $25,000 advanced by him to the company.

The receiver finds that Mr. Busch did, between June and September 25th, 1902, pay for $25,000 worth of furniture for the defendant company; that he received bonds therefor to the amount of $25,000 on this account; that on September 25th, 1902, a resolution of the company was passed pledging to him $40,000 of the bonds of the company, and that $15,000 more bonds were thereafter delivered to him, making the $40,000 of bonds claimed to be held by him as collateral for his loan of $25,000 to the company; that at this date, September 25th, 1902, the defendant company was either actually insolvent or in contemplation of insolvency.

The receiver determines that the resolution of September 25th, 1902, was (as to the $15,000 of bonds then or thereafter issued to Busch) an attempt of the directors, in contemplation of the insolvency of the company, to transfer its property to Mr. Busch, a fellow-director and president of the company, for the purpose of saving him from loss of the $25,000 which he had theretofore advanced.

The directors of any corporation which is unable to respond to its usual and ordinary pecuniary obligations are forbidden to transfer its property by the sixty-fourth section of the Corporation act. *P. L. 1896 p. 298; National Bank* v. *Sprague, 21 N. J. Eq. (6 C. E. Gr.) 530; Skirm* v. *Eastern Rubber Co., 57 N. J. Eq. (12 Dick.) 179.*

That this was the actual financial condition of the defendant

company on and before September 25th, 1902, and that Mr. Busch, a director and its president, knew of its impending failure is shown by this very transaction. Mr. Busch's own testimony shows this. He testified that so early as the middle of June, 1902, the company had no money for furnishing the hotel; that the various furniture houses refused to allow it credit; that a meeting of the company's directors was called, to which no director came but himself and Dr. Batt. Mr. Busch was obliged to take up several bills owing by the company, to pay which it had no funds. The company, though nominally capitalized at $250,000, and having then issued bonds of a face value of more than $200,000, had not sufficient money to buy furniture for its hotel, without which it could not do business. It kept no bank account which would justify it in applying for a loan. Mr. Busch says: "It became a question of either getting the money from some source or shutting up the hotel for the summer, practically giving up the project." He says he agreed to advance the $25,000 on the $40,000 of bonds and the proportion of stock which accompanied those bonds as collateral to the loan. Mr. Busch says he took the whole $40,000 of bonds in a lump, but he elsewhere testifies that after the first issue of $81,500 of bonds to the Clarence M. Busch Land Company as purchase price for the land, the rest of the bonds were delivered to him from time to time as he advanced the $25,000 in five different payments between August 29th and September 2d, 1902. Mr. Busch testifies that the company was not then insolvent, but the facts proven contradict his conclusion.

Dr. Batt, the secretary and also treasurer of the company during the period, testifies that Mr. Busch received these bonds from time to time in amounts corresponding to the payments made by him. This being the situation, it appears that on September 2d, 1902, the date of the last payment by Mr. Busch, he had advanced the whole $25,000 for the company and had received therefor $25,000 of its bonds.

On September 25th, 1902, the company appears for the first time to have taken formal corporate action on these advances which had theretofore been made by Mr. Busch. On the min-

utes of that day is a resolution which refers to the fact that Mr. Busch had advanced $25,000 from time to time to the company. It directed the officers of the company to make him a note for that amount, and to issue to him as collateral security its first mortgage bonds to the amount of $40,000, and also an additional mortgage of $35,000 for past and also further advances, &c. The resolution deals with the transaction as an original giving, on September 25th, 1902, of the whole $45,000 of first mortgage bonds as collateral security to Mr. Busch for the payment of the company's antecedent and then existing debt to him. Nothing in the resolution indicates that there had been any preceding agreement on the part of the company by which Mr. Busch was to advance $25,000, in consideration of which the company would give him $40,000 of bonds as collateral security. That phase of the case first appears on September 25th, 1902, by this resolution. Previous to that time Mr. Busch had actually received, without any formal corporate act, $25,000 of the bonds as he from time to time paid out money for the company. The only effect of the resolution on the bonds was to get for Mr. Busch the $15,000 of bonds thereafter delivered to him in one batch. Dr. Batt says they were so delivered to him.

At and long before this time the company's general inability to pay its debts as they came to be due was, as is above shown, plainly apparent to all its directors, one of whom was Mr. Busch.

There is no proof that the $15,000 of bonds were issued for any presently passing consideration. The weight of the evidence goes to show that there was no agreement made previous to Mr. Busch's advances that he should have $40,000 in bonds as collateral. His own conduct in taking bonds only to the amount actually advanced indicates that there was no such agreement. Mr. Busch paid nothing for the $15,000 of bonds, but, foreseeing the probable failure of the enterprise, obtained the additional $15,000 of bonds to be given him to save him from loss on his previous advances, for which he had already received $25,000 in bonds.

The phrasing of the resolution of September 25th, 1902, seems to indicate that the whole $40,000 of bonds were to be thereafter

issued to Mr. Busch to secure his pre-existing claim against the company, but the evidence *aliunde* proves that in fact the $25,000 of those bonds had been issued contemporaneously with the advances made, and not to secure a pre-existing debt.

The master on this item has, in my view, rightfully held that the first mortgage bonds, to the amount of $15,000, issued to Mr. Busch on and after September 25th, 1902, are null and void, because delivered in contemplation of the insolvency of the company to secure a pre-existing debt. Mr. Busch's appeal on this point must be dismissed.

The next appeal is that taken by Mr. Busch as bondholder, stockholder and general creditor against the master's admission of the claim of the DuParquet, Huot & Monense Company, as a mechanics' lien claim against the hotel property, prior and preferred to the lien of those first mortgage bonds which were issued to Mr. Busch to secure the payment of the $25,000 which he had expended for furniture for the hotel, and also prior to the $35,000 mortgage made by the company to Mr. Busch as additional security for that expenditure, and for future loans, &c.

The first objection to the admission of this claim is that the articles furnished are not, under the statute, capable of being the subject of a mechanics' lien.

The proof is that, under the orders of the company's officers in charge of the construction of the hotel, this claimant, the DuParquet, Huot & Monense Company, furnished a twelve-foot range, three fires, three ovens, built into the building by brick flues connecting with the chimneys, boiler and steam pipe coming through the floor and connecting with the boiler of the house, large hotel vegetable kettles connected with the steam pipes, a twenty-five-foot hood over these fixtures, also various other kitchen equipments which are fitted to the supply and waste pipes of the building.

This kitchen equipment was absolutely essential to the use of the hotel for the purposes for which it was built. Without it there would have been no hotel. The range, ovens, boilers and pipes, &c., were attached to the building in a manner indicating their absolute appropriations to that use. They were so attached

in accordance with the intention of the owner of the building and the party who furnished them that they should permanently become part and parcel of the hotel structure itself. The decision of the supreme court in the case of *Erdman* v. *Moore, 58 N. J. Law (29 Vr.) 445*, determines that such fixtures, so attached and intended to be part of the building, may be the subject of a mechanics' lien. The receiver has admitted to the lien only those articles which were attached to the building as above indicated, and has excluded movable and detached utensils.

It is also contended that this kitchen equipment was not ordered by competent authority from the company. This contention is refuted by the proofs, which show that the detail of the work was arranged and ordered by Dr. Batt, the secretary and one of the executive officers of the company in charge of the building, and that Mr. Busch, the president of the company, was in almost daily attendance there while these fixtures were being installed, and finally they appear to have been accepted and used by the company when it started in business in the following July. It is true that no formal resolution of the board of directors appears on the company's minutes expressly making and authorizing this particular contract. It also appears by its minutes that there was no meeting of the company's directors after the first one until long after the whole furnished building had been erected, accepted and in actual use by the company. No formal action of the board was necessary to obligate the company where it conclusively appears that its authorized officers acted, and that the work thus induced was accepted by the company.

It is also contended by Mr. Busch, as bondholder, that the receiver erred in holding this lien claim to be prior to those of the first mortgage bonds which were turned over to Mr. Busch as security for moneys paid by him for the company, and to the mortgage for $35,000, also given him, under the resolution of September 25th, 1902, as security, &c.

Mr. Busch insists that the receiver's above-named adjudication is contrary to the rule laid down in *Central Trust Co.* v. *Continental Iron Works, 51 N. J. Eq. (6 Dick.) 605*, where it

was held that although the owner commenced the building before the mortgage bonds were issued, yet the holders of the bonds had a lien relating to the time when the mortgage was recorded, which was prior to the commencement of the building.

If that case is carefully read it will be found that the transaction was a mortgage, expressed on its face, to secure future advances, and that it was given priority because in that case neither the trustee nor the bondholders had actual notice of the subsequent encumbrances (at *p. 608*). But in the case at bar, Mr. Busch, who became the bondholder in the latter part of August and first of September, 1902, had full notice long before of the outstanding unpaid debt of the company for the kitchen fixtures which under the statute constituted the lien, and having this knowledge and warning, he took his first mortgage bonds and his $35,000 mortgage, not by purchase in open market, with the equities that might thus attach, but direct from the company, by private bargain, to secure advances which he made to the company, not only after the liens had attached, and after he knew the facts, but also after he knew that the company was insolvent and that the lienholders would be compelled to look to the enforcement of their liens to collect their debts.

Considering this objection from the point of view of Mr. Busch, as a mortgage bondholder, the receiver's adjudication was correct. But even if the receiver were wrong in this particular, his mistake would only apply to those bonds which Mr. Busch received for a presently passing consideration, because the transfer of the $15,000 of first mortgage bonds and the giving of his $35,000 mortgage, both of which he took to secure the debt previously owing him by the company, are null and void, as above shown, under the statute, because taken in contemplation of the company's insolvency.

It will be found (as an additional support of the receiver holding that this lien claim should precede Mr. Busch's $40,000 of first mortgage bonds and his $35,000 mortgage) that the mechanics' lien statute, as re-enacted in the revision of the Mechanics' Lien law of 1898 (*P. L. 1898 p. 543 § 15*), has some-

what changed the law since the case of *Central Trust Co.* v.*Continental Iron Works, ubi supra,* was decided in 1893.

By section 28 (*P. L. 1898 p. 550*) it is provided that the sale under the lien claim judgment shall pass title subject to any mortgage given under the circumstances contemplated by and in conformity with the provisions of section 15 of that act. Section 15 provides that any mortgage recorded before a lien claim is filed shall have priority to the extent of the money actually advanced and paid by the mortgagee *and applied to the erection of any new building on the mortgaged premises.* The test is whether the mortgage-money has been loaned for and actually applied to the erection, &c., of the building. *Young* v. *Haight, 69 N. J. Law (40 Vr.) 453 (Supreme Court).*

In the case at bar it is not even claimed that any of Mr. Busch's money which is secured to be paid by the $40,000 of first mortgage bonds, and by his $35,000 mortgage, was applied to the erection of the hotel building. The undisputed proof is that all of it was spent by Mr. Busch himself in the purchase of furniture for that hotel.

The receiver's admission of the DuParquet, Huot & Monense Company's claim as a lien prior to Mr. Busch's $40,000 first mortgage bonds and to his $35,000 mortgage should be sustained and the appeal dismissed.

The only remaining appeal is that of Mr. Busch against the receiver's admission to a dividend of that part of the claim of Milligan & Webber which is based on their furnishing of working plans and drawings for the hotel building.

There were two items in their claim, one ($3,125) for plans and drawings, the other for $2,500 of bonds and half as much stock for securing sub-contractors for the work, &c. The receiver allows the first, and from this allowance Mr. Busch appeals. The receiver refuses to allow the last, and from this decision Milligan & Webber have not appealed.

The testimony in the cause shows that the plans and drawings of Milligan & Webber were competently ordered, and were accepted and used in building the hotel, and that the price charged was the ordinary price for such services.

The receiver's adjudication should be sustained and the appeal dismissed.

I will advise an order according to the views above expressed.